In the Matter of the Accounting of THE NEW YORK TRUST COMPANY, as Executor of and Trustee under the Will of ELBERT H. GARY, Deceased.

EMMA T. GARY, Appellant; GERTRUDE G. SUTCLIFFE et al., Respondents.

(Argued January 25, 1933; decided March 7, 1933.)

*George W. Whitesiae, J. Arthur Leve, Frederick M. Davenport, Jr.,* and *Robert M. Bozeman* for appellant. The will is, both by its literal provisions and by its spirit, instinct with the intention of the testator to relieve his widow of the burden of carrying the real property after she has surrendered the use thereof, whether that burden be by a direct charge or an indirect charge. (*Spencer* v. *Spencer,* 219 N. Y. 459; *Lawrence* v. *Littlefield,* 215 N. Y. 561; *Matter of Jackson,* 258 N. Y. 281; *Eagan* v. *Mahoney,* 24 Col. App. 285; *Davidson* v. *Bright,* 267 Penn. St. 580; *Matter of Loew,* 291 Penn. St. 22; *Yerkes* v. *Yerkes,* 200 Penn. St. 419; *Furniss* v. *Cruikshank,* 230 N. Y. 495.)

*Gerald Donovan* and *Raymond D. Thurber* for Gertrude G. Sutcliffe et al., respondents. There is no direction or authority in the will, express or implied, to pay the charges, or any part of them, out of the separate and independent residuary trusts created for the benefit of the decedent's daughters. (*Tilden* v. *Green,* 130 N. Y. 29; *Herzog* v. *Title Guarantee & Trust Co.,* 177 N. Y. 86; *Matter of Bump,* 234 N. Y. 60.)

*Royal A. Curtis* for George H. Harman, special guardian of Elbert G. Sutcliffe et al., respondents.

*William Averell Brown* and *Kenneth B. Halstead* for New York Trust Company, respondent.

CRANE, J. Elbert H. Gary died in 1927 leaving a very large estate, which by his will he devised equally between his second wife and his two children. His home on Long Island at Jericho, in the town of Oyster Bay, called " Ivy

Hall," he gave to his wife for life, provided she paid the upkeep, but should she find this too much of a burden then he directed his executor to sell it and pass the proceeds to the principal of the trust for her. The executor, having taken over Ivy Hall, and being unable to dispose of it in a favorable market, has asked the court which fund should be charged with its maintenance, the estate of the testator or the trust for the widow. The intention of Gary, as manifested in his will, is the answer to the inquiry. What did he do and what did he say? Let him speak for himself.

The will leaves $800,000 in trust for the daughter Gertrude Gary Sutcliffe, the income to be paid to her during her natural life, thereafter to her son, and upon his death the principal to go to his surviving issue. Another trust of $800,000 is created for the daughter Bertha Gary Campbell for her life, and upon her death for the life of her daughter, the principal thereafter to the daughter's issue. For the widow the following provision was then made, known as article VI of the will, which reads as follows:

" ARTICLE VI.

" Section 1. I give, devise and bequeath unto my wife Emma T. Gary, for her own use and occupation during the term of her natural life, unless sooner forfeited or surrendered as hereinafter provided, and without impeachment of waste my real estate known as ' Ivy Hall,' comprising about one hundred and nine and seven hundred and seventy-five thousands (109.775) acres situated at or near Jericho in the Town of Oyster Bay, County of Nassau and State of New York, together with all buildings and structures thereon and all furniture, clothing, pictures, works of art, silver, plate, ornaments, bric-a-brac, household goods or supplies, books, linen, china, glass, automobiles and all implements, plants and tools which may be in or upon my said real estate at the time of my death or shall then be customarily used by

me in connection therewith, excepting, however, any and all personal property bequeathed by Article III of this my will and also any and all live stock. I direct that no inventory or security shall ever be required of my said wife in respect of any of the articles of personal property by this Section of my will bequeathed to her for life, and neither she nor her estate shall ever be held liable for any consumption, use, damage, loss or injury in respect to any of said articles.

" Section 2. The cost of all necessary repairs to said premises and all taxes, assessments, water rates and other governmental charges thereon shall be paid by my said wife while she has the use of the same. My said Executor and Trustee, or its duly authorized agents, shall have access to said premises at reasonable times for the purpose of ascertaining whether all necessary repairs have been made, and all receipted bills for taxes, assessments, water rates and other governmental charges thereon shall be placed in the custody of said Executor and Trustee. Neither my said wife, the remaindermen nor said Executor and Trustee shall be required to insure the improvements on said premises or their contents against loss or damage by fire or otherwise, leaving it to my said wife and the remaindermen, at their own cost and expense and without right of reimbursement for insurance premiums one as against the other, to insure their respective interests if and when they desire so to do.

" Section 3. In case my said wife does not herself use and occupy said premises or in case she fails or neglects to repair the same or promptly to pay the cost of such repairs and all taxes, assessments, water rates and other governmental charges, or any of them, or in case she notifies my said Executor and Trustee that she desires to surrender her life estate in said premises because the maintenance thereof will be or has become burdensome to her, or upon the death of my said wife in case her life estate in said premises has not been sooner forfeited or

surrendered, my said Executor and Trustee shall sell said premises, provided it shall be convinced that the price which can be obtained therefor is fair and reasonable and the proceeds shall thereupon be added to and become part of the principal of the trust created by Section 3 of Article X of this my will and thereafter be held in trust for the uses and purposes therein stated."

These provisions, with some other general legacies, by no means exhausted the estate of the testator. There remained a large residue which the testator disposed of by dividing it into three parts and creating three trusts. The income from one of these trusts was to go to his widow, Emma T. Gary, during her natural life, and upon her death the principal was to be divided equally between the other trusts created for his daughters. Another of these trusts in one-third of the residuary he gave to the executor-trustee to pay the income to his daughter Gertrude Gary Sutcliffe during her natural life, and to her son Elbert Gary Sutcliffe during his natural life, and upon his death the principal was to be given to his lawful issue. The other trust in the one-third of the residuary was given to the executor-trustee to pay the income to his daughter Bertha Gary Campbell during her natural life, then to her daughter Julia Elizabeth Campbell, and at her death the principal to be paid to her lawful issue.

Section 5 of article XIV of the will reads as follows: " I direct my said Executor and Trustee as soon as practicable after my death to sell upon the terms and conditions stated in Section 6 of this Article XIV all of my real estate, excepting such as is devised by Article VI of this my will " (the Ivy Hall provision for the wife).

Section 6, referred to, reads as follows: " I hereby authorize and empower my said Executor and Trustee to sell, in its discretion, at public or private sale, all or any part of my estate, real or personal, at such price or prices and upon such terms as it may deem best and most expedient and to execute, acknowledge and deliver to

any purchaser or purchasers thereof good and sufficient deeds of conveyance and instruments of transfer."

Referring to these provisions for the conversion of his estate from realty into personalty, the testator says: " I do not specifically devise or bequeath unto my said wife and children any real or personal property, except as provided in Articles III and VI of this my will, because I think it better to furnish them with money and thus give them the opportunity to buy what they may deem suitable to their respective tastes, convenience and happiness."

This in outline is the scheme and plan of the testator for the disposition of his property between his widow (second wife) and his grown-up and married children. How much real estate the testator left we do not know. He explains why he has not given specific real property and has directed its sale and conversion into personalty.

There would be, therefore, a considerable period of time before the trusts could be set up. Debts would have to be paid, general legacies met, the real estate sold upon favorable terms, and the proceeds set aside for the three trusts created out of the residue. In the meantime, expenses would be accruing for the maintenance and upkeep of the real estate and these necessary charges would be taken from the corpus of the estate, from the principal and not from any particular trust fund. We may say, therefore, that the general plan and scheme of the testator was that where real property was left by him and was to be sold by his executor-trustee, the charge of maintaining that real property was to be paid out of his estate or the funds which would later constitute the principal of the trust funds.

We think we see the same desire and intention expressed regarding Ivy Hall, the real estate left to the widow, by article VI. She was to have it for life, unless the charges and the upkeep were a burden to her. Then she could give it back to the executor-trustee to be held in the same

way as the other real estate of the testator and upon the same terms and conditions. It was to be sold in a favorable market, the proceeds to go to the widow's trust fund. The maintenance of Ivy Hall, after the executor had taken possession of it, would then be paid for out of the general funds of the estate, the entire residuary interest, in the same way that the other real estate charges were met. While the proceeds of Ivy Hall were to pass to the widow's trust, this merely balanced the disposition made for the two daughters by the creation of an $800,000 trust fund for each, separate and distinct from the trust created for them in the residue. In place of an $800,000 trust fund, the testator had given Ivy Hall to the widow and naturally would pass the proceeds of Ivy Hall to the widow's trust. This, however, in no way disarranged the scheme whereby the executor-trustee was to pay the charges on all the real estate in its possession prior to the time of sale, as directed in the will.

We see this idea very clearly indicated by section 2 of article VI. The cost of repairs and all taxes and assessments and water rates on Ivy Hall are to be paid by the wife "while she has the use of the same." This word "while" expresses limitation. The widow is to pay these charges up to the time that she abandons the place and turns it over to the executor-trustee, or up until the time the latter takes it from her. From then on the executor-trustee will meet these expenses out of the general funds of the estate. The duty of the executor-trustee over Ivy Hall is further stressed by the direction that it shall have access to the premises at all times to see if the repairs have been made; further, all receipted bills for taxes and the like are to be given to the executor-trustee. Why was this? To keep the place, Ivy Hall, in shape and in condition, not merely for the widow, but for the remaindermen, who were the two daughters. At the death of the widow, Ivy Hall was to be sold and the proceeds passed to the trusts for the two daughters.

It was to their interest to keep up the place and to have all taxes, charges and repairs met and paid. The same disposition followed in case the widow surrendered possession to the executor. It was then to sell the place, " provided it shall be convinced that the price which can be obtained therefor is fair and reasonable," and the proceeds, while passed in the first instance to the widow's trust, were to pass on her death to the trusts for the two daughters. The discretion or direction given to the executor-trustee to wait for a fair and reasonable price was as much for the benefit of the two daughters — remaindermen — as for the widow. Why should she pay all the charges upon the real estate while the executor was waiting for a fair price? This might take years, under the present depressed condition of the real estate market. A fair price meant more money for the daughters and their children as well as for the widow. In all reason they should share in these charges piling up upon the real estate while waiting for a market or a fair price. The price inures to their benefit equally with the widow.

The decision of the Appellate Division has placed these charges alone upon the principal of the trust fund for the widow. She acted under section 3 of article VI of the will and notified the executor-trustee that she desired to surrender her life estate in said premises because the maintenance thereof had become burdensome to her. The testator made this provision to relieve her from the burden. The Appellate Division's decision has merely shifted the burden from her income to her principal. These charges upon the real estate, accruing every year, until the time arrives for the executor-trustee to sell in a favorable market, reduces yearly the principal of the trust fund and decreases every year the income of the widow from the trust. Little by little it goes down. Nowhere in the will do we find any such intention on the part of the testator. He has attempted to treat his widow and two children alike, while the interpretation

given by the court below would increase the trusts for the daughters and yearly decrease that for the wife. The widow, having surrendered Ivy Hall, and the executor-trustee having taken it, the cost of all necessary repairs to said premises, all taxes, assessments, water rates, governmental charges and the expenses of maintaining it in fit and proper condition for sale, are to be paid out of the general funds of the estate like the charges on other pieces of real property not yet sold. In other words, the expense is to be borne equally by the principal of the residue devised as a trust fund to the widow and the two daughters. The expense is not be be charged to the principal of the widow's trust alone.

For these reasons the order of the Appellate Division should be reversed, and the decree of the Surrogate's Court affirmed, with costs in this court and in the Appellate Division, payable out of the estate.

POUND, Ch. J., KELLOGG, HUBBS and CROUCH, JJ., concur; LEHMAN and O'BRIEN, JJ., dissent.

Ordered accordingly.